Good morning. May it please the Court, my name is Haleh Mansouri, representing Petitioner Dr. Haghighatpour. There are several issues before this Court, namely whether there is compelling evidence that Dr. Haghighatpour was subjected to battery and extreme cruelty, thereby qualifying him for cancellation of removal as a battered spouse, and whether the IJ and the BIA erred in denying petitioner's applications for Dr. Haghighatpour's application was based on the evidence that he was more likely than not that he would be persecuted if he was sent back to Iran. The notes from the arrest report that the IJ relied on are primarily all the statements that were taken by Ms. Sheerdel, who is petitioner's wife at the time. In fact, the officer's notes states that, quote, I did not locate any signs of physical abuse on Sheerdel. And all the damaging statements are from Ms. Sheerdel's statements. The other witnesses that were interviewed by the officers – Excuse me. Was he convicted of this or only arrested for it? I'm sorry? Was he convicted of the spousal? No, he was not convicted. In fact, when they went to court, she came and stated that it's not true, there was no abuse, and everything was dismissed. Which that is consistent with all the testimony that was given in court about how this person is pretty much crazy and not stable. And there was numerous witnesses who testified about the mental condition of Dr. Hayekapour's wife. But the court conveniently overlooked all of those and solely relied on Ms. Sheerdel's statements in this arrest report. Also, the court never even requested for Ms. Sheerdel to come to the court to testify about any of the statements that she had stated. In contrast, we had several witnesses in court who explained how Dr. Hayekapour was in fact subject to cruelty. The most significant of the witnesses was Dr. Porverni, who was the expert witness. And we're now talking about the spousal abuse directed towards the husband. Exactly. Yes. And Dr. Porverni – There was a doctor, and then you tried to put on some other people, but they never actually testified, or is that – There were actually – there was altogether six witnesses. Two expert witnesses in reference to asylum case and withholding, and four in reference to the cancellation of removal case. There were numerous other affidavits that were supported. And we did have witnesses prior to the final hearing, but they were not able to come to the final hearings. But Dr. Porverni, who was the expert witness and who had seen Dr. Hayekapour at least 10 times, stated that Hayekapour's actions are typical of victims of domestic violence. The doctor was terribly – that he was terribly distressed, agitated, had lost weight, had not bathed in days, and was exhausted from lack of sleep. And Dr. Porverni further explained that during the sessions that she had had with him, he had explained how he was so happy to be coming here from Germany, and how disappointed he became when he – and actually extremely scared of her wife, because she would force him to have sex, he stole his ID, and they – and she stated – and just basically that her conclusion was that this is a classic case of battery. And I'm quoting that. And she had diagnosed him with having post-traumatic stress disorder. I will not go into the other witnesses that for erroneous reasons the IJ said are not credible, but they also testified, including Reza Kassihi, Maryam Kassihi, and Kamyar Chamasmani, who were witnesses testifying how the wife had battered Dr. Hayekapour. Now, going to the issue of asylum from Germany as well as from Iran, there are two issues here. One is the issue of firm resettlement, and the second is whether the asylum application was filed on a timely basis. And the issue of timely basis, as we noted, the doctor filed – there is discrepancy as far as exactly when the application was received. But as was noted, there is a stamp on the asylum application that says March 7, 2000, which is one day short of the anniversary of Dr. Hayekapour coming to the United States. And the stamp, while not 100 percent legible, I believe it's legible enough to show that it is March 7, 2000. The court, however, held that it was March 14, 2000, a few days after the anniversary of his entry into the United States. And even if we assume argument that that is correct, it is March 14, appellant's adjustment of status based on his wife was denied on February 24, 2000. So just a few days after that, that's a reasonable period of time, after changed conditions in his case for him to have submitted the asylum application. So based on that, then, the asylum was timely filed. Another argument that the service raises is that under Section 208, small b, 2, capital A, Section 6, it states that appellant cannot get withholding from Germany if he has been firmly resettled there. But that is an erroneous way of – Or asylum. Or asylum. However, what specifically that section says, it says that if the alien was firmly resettled in another country prior to arriving in the United States. And another country here refers to another country from the country that the person is seeking asylum. So even if we assume that – we'll get to that point later – firm resettlement, even if he was firmly resettled in Germany, if he's been persecuted in Germany, he is entitled to apply for asylum. Because he's not getting – applying for asylum from a third one. It's the country of persecution. We got the argument, and you want to save a little time. But what if – if, on the other hand – I would like a little assistance with the firm resettlement question. If we didn't think that his asylum from Germany was okay. Because that's the murkiest part of the record. He says at one point he was permanently resettled in Germany, but not really permanently. I don't know what that meant. Yes. And that's the issue, is while he did live there in Germany for a number of years. And he had some sort of official legal status. Yes, he did. However, in Germany – and he even got his license as a medical – he went to school. He became a medical doctor and a dentist and received the appropriate – but was not – And then when he tried to find a job as a professor, he was given the job. However, at that time he had become a member of Church of Scientology. And the – But that's not the question. Because the question is, was he permanently resettled? Does permanently resettled have to mean that you have every – every prerogative of a citizen? Well, here the issue is whether he was able to work or not. He wasn't able to work in his field of profession. Well, he was able to work in Germany. I mean, he would have been able to work if he wasn't a member of the Church of Scientology. So that's a different question. But that wasn't the reason why he couldn't work. Well, basically what he ended up doing, just doing freelance giving lectures, because he was not able to have a position in his field as a doctor or a dentist, nor as a professor, because he had to sign a letter saying, you know, I will not any longer be a member of the Church of Scientology. So under these conditions, when he's really not able to avail himself of the protection like a normal citizen would, and on top of that also, there were several death threats that were given by agents of the Iranian government, and how the police would ask him to just change his address, and he had to abandon his home. In other words, he was not able to receive the same protection as a normal citizen would in Germany, which this ties in with his asylum and withholding claims in Germany. One thing I want to just quickly bring to the attention of this court is the case of Afrayi versus Holder, which Honorable Berzon and Honorable Fisher was argued before you. In that case, the issue of unwilling or unable was analyzed. How come you're leaving me out? I'm sorry? I think your time's up. My time's up? Yeah, go ahead. Because in that case, what the court held was, which was an issue here because the judge held that, well, you could have relocated to a different place or the police were willing to help you, but they never looked at whether they were able to do so or not. And in this case, the court first held that it is not essential to demonstrating Reporting persecution to government authority is not essential to demonstrating that the government is unable or unwilling to protect him from private actors, and that even if the government is willing but is unable, then we're facing the same problems. And that is exactly the case here, that the government, even though a couple of times Dr. Hayekatpour did report to the police, about the incidents that happened, including getting hit because being a foreigner there by neo-Nazi Germans, and also how three young men came to his home and beat him up again for being a foreigner by neo-Nazi. And so what the government basically told them, the police, that you have to relocate. And in another incident, they said, well, you have to pursue private civil action, not criminal. We're familiar with that. Right. So in both of those cases, the government was not, even though they possibly were willing to do so, arguably they were not able to do so. But look, you're way over your time. Way over my time. Way over your time. Thank you very much. Okay, thank you. Good morning. Jessica Sherman on behalf of the respondent, Eric Holder. In this case, petitioner applied for numerous forms of relief. However, it was his burden to show that he was eligible for such relief, and he did not meet that burden. On appeal, he must show that the decision by the agency was not supported by substantial evidence. Again, it was his burden, and I think that's important to note. But it was your burden, so if I just dive right in on firmly resettlement. On firmly settlement. Okay, it's your burden to show. That he was firmly resettled. Correct. Now, you know, counsel, we'll get along much better if you let me finish my question so you don't launch into something that I'm not asking about. Okay. I apologize, Your Honor. I didn't mean to interrupt you. It's your burden under our in-bank decision, Maraj, to establish that you are unable to provide direct evidence of permanent resettlement before you can go to circumstantial evidence. Now, have you done that? Yes, there was testimony by petitioner that he was granted permanent residence. I'm asking you whether the government proved that you cannot provide direct evidence. If you're going to the circumstantial evidence, I'm asking you to address what the in-bank opinion requires of the government. Well, while it is the government's evidence to produce evidence that he was firmly resettled, the alien's own testimony can meet that burden. I don't believe that there was a copy of his German passport or a document that stated that he had permanent residence status there, but he did testify to that fact, and I think that there's no question that he was granted it. Well, what he testified, as I understood it, was that what he said was something like, it was permanent, but it wasn't really permanent, and meaning, A, he couldn't work as a doctor or dentist, although he was trained as both. That's what he testified to, and it wasn't contradicted. And secondly, he couldn't travel, I think, or couldn't travel much. He did testify that he traveled in and out of Germany to London. Much. But he said something about he couldn't travel, something to the effect of he couldn't travel very much or for very long, something like that. He did testify that he would have lost his status if he remained out of the country for six months. However, that's the same as U.S. law. You lose your lawful permanent residence status if you are not out of the country for six months. It's just a requirement for lawful permanent residence status in Germany. However, he was able to go to school there. He married. He had children. But he couldn't work as a doctor. He stated that he was unable to obtain a license to practice as a doctor because he was not a German citizen. However, there was other evidence that if he had married a German citizen, he would be able to obtain this license. And he was married from 1991 to 1994. I never explained how he was not able to get the license under that. He stated that he didn't try to get the license then because he was pursuing a dental degree. He also was able to work as a professor of anatomy and physiology. Okay, but here's my concern. That's why I'm asking for your help. Our M-Bank opinion was very precise. We adopted an offer-based structure of analysis in which you're citing are his circumstances. And what it says is DHA bears the initial burden of showing that the government of the third country issued to the alien a formal offer of some type of official status permitting the alien to reside in that country indefinitely. Okay. I'm sorry. I need to interpret it for you. So have you established a formal offer? Yes, through his own testimony. And as this court explained in She Begins All Emotions. Okay, so you're going to go to his testimony. So it goes on. This burden can be met by direct evidence of an offer. Or if DHS shows that direct evidence of a formal offer is unobtainable, then surrogate non-offer-based evidence may suffice for the initial showing if it is of sufficient force. You haven't convinced me yet you've gotten to that second prong because you haven't shown that you couldn't get direct evidence. It seems to me what the M-Bank decision is requiring the government to do is to look to German procedure and find whether the German government has issued a formal offer of resettlement. That's your burden. However, his testimony, I think, established that point, and so there was no need to go further. Could you read the testimony that establishes that, please? I'm sorry? Could you read us the testimony that establishes that? I don't know. I believe it's on page 392 of the record, Your Honor. He was asked, Were you ever given a permanent residency in Germany? And he said, Yes, I have. I have. I had a permanent residency. If someone is living in Germany five years, after five years they give this person something they call an unlimited resident permit. Then he goes on to say that there were limitations to it. However, I think that goes to the next step. which is how an alien can rebut a finding of firm resettlement, which is to show either that he only remained in the country as long as necessary to arrange onward travel, which clearly is not even alleged here, or that the conditions of his firm resettlement were so substantially restricted that he was not, in fact, firmly resettled. Now, he claimed he had trouble getting a medical license, but I think that's a stretch to say that that's so substantially restricted  that he can't go to school, get a job as a professor, and so that's insufficient for him to rebut the presumption. Moreover, the fact that he claims he's now lost his status by remaining outside of Germany for more than six months, as this court recognized in Maharaj, that the alien's own steps to have travel authorization or permission to reenter the country does not bar finding a firm resettlement. He remained in Germany for 19 years, and I think given all of his substantial ties, including his marriage there and the birth of his son there, it shows that he was firmly resettled, which is a bar to asylum, contrary to what Petitioner says. He also testified that the sort of residency he had in Germany meant that if he had no job and wasn't enrolled in the university, he would lose his right to stay in Germany. I'm not sure. 403. Again, I'm not clear, I mean, what details he was referring to. I mean, he did testify that he had permanent status there and remained there for 19 years, and it wasn't because of any of these limitations that he alleges that caused him to leave Germany. In fact, he lived on his own volition. I mean, this court has recognized in she and in Maharaj that firm resettlement, the key factors to consider are the alien's ties to the country, and here I think the ties are more than substantial. And again, he has to show that the record compels a contrary finding, and I don't think he's met that burden today. Does the United States know what the German process is for granting permanent residency? It's not in the record, Your Honor, so I can't speak to that. Yeah, that's why I find, why we're spending all of this time debating out of his mouth, why the government doesn't take Maharaj seriously and just, I mean, Germany is an ally. Germany is an easy country to go to and say, here's, and understand what their immigration rules are. It's not in the record, and I just find that confounding. Yes, Your Honor, I understand your... Was this case tried before, presented before Maharaj? I don't know the date of Maharaj offhand. I can look it up. The date of Maharaj is 2006. Yes, so this case was prior to Maharaj because it was before the immigration judge in 2005. All right. I would hope that post-Maharaj, because, you know, you see how many immigration cases you all know we have on calendar. Anything you can do to follow our case law to help us out so we don't have to spend time on collateral issues is much appreciated. Thank you. You know how we got all these cases. How you got all these cases? Lots of people. By the grace of the Attorney General Ashcroft, they dumped something like 7,000 or 8,000 on us at one time without having any of them pass through the BIA. Well, that was 50,000. 50? How many was that? Anyway, that's not her fault. I know, but, I mean, you know, young people need to learn a little bit about history. And so he's here, and he's practicing medicine and dentistry. Is that right? I believe he was employed by University of Southern California. However, his visa application filed by the University of Southern California was denied. Turning to his other applications for relief, substantial evidence supports the finding that he was not a battered spouse and, therefore, ineligible for special role cancellation. Although there was conflicting testimony about what happened on the night of May 10, 1999, the balance of the evidence as a whole was not sufficiently compelling to establish that this petitioner was a battered spouse rather than the batterer. There are police reports in the record. There are restraining order that his wife obtained against him showing that he committed violence. There's also documentation that she received bruises and marks on her neck that the police reported. Turning to his claims from Germany, the petitioner has not challenged the finding with regard to past persecution. So the sole issue now is whether he has shown that it's more likely than not that he faces future persecution in Germany. This claim is highly speculative, particularly in light of the fact that these claims happened a long time ago. And the evidence submitted with his motion to reopen shows that Germany is taking very active steps to combat discrimination and violence against foreigners. On August 18, 2006, the German government passed an anti-discrimination law. The government monitors right-wing extremists. His basic claim, or it seems his most important claim, is that the Iranian government or extremists are pursuing him in Germany. We're pursuing him in Germany. And what if he returned? And what about that? Well, I think that it's speculative that he would face any harm, especially in light of the fact that Germany has continued to take steps to protect foreigners. And although there's discrimination in the generalized sense. But this is not foreigners from other Germans. It's foreigners. I mean, it's certainly not a crazy story that the extreme Iranian government might still be after agents of the Shah, which he was supposedly one of. I think because there's two separate issues you raised with regards to Germany. First, he said that Iranian radicals were after him, which is, I think, the point you're getting to. That's what I'm asking you, then. Well, I think it's important that this book that was published was published over 30 years ago. So the fact that they would still be interested in him over 30 years later seems highly suspect. And other than the two weeks of phone calls he received in 1998, he hasn't actually claimed that he had any past experiences with the Iranian radicals, just that he knew people that knew people that had been harmed by Iranian radicals. And I think it's important that all of his witness testimony about these other people that were killed by Iranian radicals were very high-profile individuals. There was a professional singer and performer that they testified about being killed. But Mr. Hagi Hakkor is not one of these high-profile individuals. He hasn't shown that he's a high-profile individual. Again, the police have responded to his phone calls, but he never identified who the suspects were for the police to be able to pursue the claims without any evidence of who the police needed to go after. He hasn't shown that the government is unwilling and unable to protect him. Well, listen, you're over time, and I just wanted to balance these two up. Okay. Well, I appreciate your time, Your Honors, and request the court tonight to petition for a review. Thank you. Okay. You've had all your time. I'm sorry, but that's the way it works. No, no. Okay. Okay. This matter's submitted.
judges: Pregerson, Fisher, Berzon